Brendan P. McGlynn
John V. Donnelly III
Oreste P. McClung
Attorneys for Plaintiff
Securities and Exchange Commission
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                 Plaintiff,<br><br>                    v.<br><br>DAVID F. MARCHAND,<br><br>                                 Defendant. | Case No.<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission"), 701 Market Street,

Suite 2000, Philadelphia, Pennsylvania 19106, alleges as follows against Defendant David F.

Marchand, whose last known address is 171 Del Prado Drive, Campbell, California 95008:

## SUMMARY

1.      This matter involves unlawful insider trading by Defendant David F. Marchand

("Defendant" or "Marchand") in the securities of three issuers:  SuccessFactors, Inc.

("SuccessFactors"), Ariba, Inc. ("Ariba") and SAP AG ("SAP").  In 2011 and 2012, Marchand,

who was a Board Assistant to SAP's Co-Chief Executive Officer, breached duties he owed to

SAP and its shareholders by executing illegal trades based on material nonpublic information

about two SAP acquisitions and an SAP earnings announcement. Through his illegal conduct Marchand realized ill-gotten gains of $43,500.

2.      First, while in possession of material nonpublic information concerning SAP's intention to acquire SuccessFactors, Marchand purchased SuccessFactors common stock between November 21, 2011 and November 28, 2011, in advance of the December 3, 2011 public announcement that SAP and SuccessFactors had entered into a merger agreement pursuant to which a subsidiary of SAP would acquire SuccessFactors for $40 per share in a tender offer. The price of SuccessFactors common stock increased 51.4 percent after the announcement, and Marchand sold his shares, realizing illicit profits of $28,061.

3.      Second, in early January 2012, Marchand became aware of material nonpublic information regarding SAP's favorable financial performance for the fourth quarter and year ended 2011, including its "best ever" software revenue numbers. After learning this information, Marchand purchased SAP American Depositary Receipts (ADRs) prior to SAP's January 13, 2012 public release of its preliminary fourth quarter 2011 results. Marchand then sold his SAP ADRs, realizing illicit profits of $2,157.

4.      Finally, a few months later, after he learned material nonpublic information about SAP's intentions to acquire Ariba, Marchand purchased Ariba common stock on April 16, 2012, May 2, 2012 and May 8, 2012, in advance of the May 22, 2012 public announcement that a subsidiary of SAP and Ariba had entered into a merger agreement pursuant to which a subsidiary of SAP would acquire Ariba for $45 per share of common stock. The price of Ariba common stock increased approximately 19 percent after the announcement, and Marchand sold his Ariba shares, realizing illegal profits of $13,282.

5.     By knowingly or recklessly engaging in the conduct described in this Complaint, Marchand violated, and unless restrained and enjoined, will continue to violate Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3].

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such acts, practices, and courses of business and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

7.     This Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].  Defendant, directly or indirectly, made use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged herein.

8.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the District of New Jersey.  For instance, in order to effectuate the unlawful insider trading described herein, Marchand opened a brokerage account serviced by an entity based in this District, and Marchand transferred monies into and out of that account in connection with the trades described herein.  In addition, securities purchases and sales at issue in this action were transacted on or through the facilities of a national exchange or an electronic inter-dealer quotation system operating in this District.

3

## DEFENDANT

9.      **David F. Marchand**, age 41, lives in Campbell, California.  From at least September 2011 through February 29, 2012, Marchand served as Board Assistant to SAP's Co-Chief Executive Officer and worked at SAP's facilities in Walldorf, Germany.  Marchand continued to work at SAP's facilities in Walldorf, Germany in March through May 2012 while he searched for a new position at SAP.  While serving as Board Assistant, and for a period thereafter, Marchand had access to SAP's Co-Chief Executive Officer's email and calendar, as well as SAP's Managing Board and other sensitive company materials.

## RELEVANT ENTITIES

10.      SuccessFactors was a publicly traded corporation headquartered in San Mateo, California engaged in the business of providing cloud-based human capital management solutions.  The common stock of SuccessFactors was registered under Section 12(b) of the Exchange Act and was traded on the New York Stock Exchange under the ticker symbol "SFSF." As a result of its merger with an affiliate of SAP in 2012, SuccessFactors terminated its registration with the Commission.

11.      Ariba was a publicly traded corporation headquartered in Sunnyvale, California engaged in the business of providing collaborative business solutions using cloud-based applications.  The common stock of Ariba was registered under Section 12(b) of the Exchange Act and was traded on the NASDAQ Global Market under the ticker symbol "ARBA." As a result of its merger with an affiliate of SAP in 2012, Ariba terminated its registration with the Commission.

12.      SAP AG is a German stock corporation headquartered in Walldorf, Germany that specializes in enterprise application software.  SAP and/or its affiliates completed acquisitions of

SuccessFactors and Ariba in 2012. SAP's American Depositary Shares ("ADSs"), each representing one ordinary share, are listed on the New York Stock Exchange under the ticker symbol "SAP." SAP's ordinary shares are registered under Section 12(b) of the Exchange Act. SAP's ADSs are evidenced by SAP's American Depositary Receipts ("ADRs"). SAP Labs LLC is a subsidiary of SAP AG based in Palo Alto, California.

## FACTS

13.     On December 20, 2005, Marchand signed a confidentiality agreement in which he agreed not to disclose or use SAP Confidential Information, which included, among other things, "financial information that has not been released to the public" and "future business plans."

14.     On September 5, 2011, after he had become Board Assistant to the Co-Chief Executive Officer of SAP, Marchand signed an acknowledgement of an Insider Declaration, which provided, among other things, that (i) Marchand was prohibited from engaging in insider trading, and (ii) SAP employees were not to trade in SAP shares or their derivatives during the period from the 15th on the third month of any reporting quarter until the figures for that quarter were published by SAP.

15.     In addition, Marchand was subject to SAP's Code of Business Conduct for Employees, which contained similar confidentiality obligations and prohibitions on insider trading.

### Marchand Trades SuccessFactors Common Stock While Aware of SAP's Plans to Acquire SuccessFactors

16.     On September 27, 2011, SAP and SuccessFactors began discussions about a potential acquisition of SuccessFactors by SAP. On September 29, 2011, SAP's Co-CEO conducted a conference call with the CEO of SuccessFactors concerning the potential

acquisition. SAP and SuccessFactors continued to negotiate the terms of a potential acquisition over the subsequent two months. On October 24, 2011, SAP submitted an indication of interest to acquire SuccessFactors for $34 per share, and revised that indication of interest to $37 per share on November 9, 2011. On November 11, 2011, SAP submitted its third and final indication of interest to acquire SuccessFactors for $40 per share. That same day, SuccessFactors and SAP entered into an exclusivity agreement pursuant to which SuccessFactors would not solicit alternative acquisition proposals.

17.     In or about September 2011, Marchand became aware of SAP's plans to acquire SuccessFactors. During at least October and November 2011, Marchand had access to emails to and from SAP's Co-CEO and other SAP documents indicating that SAP was in merger negotiations with SuccessFactors and had provided indications of its interest to acquire SuccessFactors at a price per share above the then current market price of SuccessFactors's common stock.

18.     In mid-November 2011, Marchand had a role in organizing a meeting between SAP executives and the CEO of SuccessFactors. Marchand knew that the purpose of the meeting was to bring SAP and SuccessFactors closer to an agreement. Emails to and from Marchand concerning the meeting refer to "Saturn," which was the code name that SAP used in internal communications to reference the SuccessFactors acquisition.

19.     On November 21, 2011, Marchand purchased 234 shares of SuccessFactors common stock at a price of $24.50 per share and 235 shares of SuccessFactors common stock at a price of $24.35 per share.

20.     On November 24, 2011, Marchand was asked to complete and return a non-disclosure agreement concerning Project Saturn. The agreement provided for, among other

things, Marchand's acknowledgment that any information in connection with the project provided to Marchand constituted SAP Confidential Information within the meaning of the SAP Confidential Agreement executed by Marchand and that a breach of Marchand's confidentiality obligations could constitute a breach of insider regulations. Marchand completed and returned the Project Saturn nondisclosure agreement on November 25, 2011, although he was aware prior to this date that he possessed confidential information concerning the planned acquisition.

21.     On November 25, 2011, the same day Marchand completed the nondisclosure agreement, he purchased 1,046 shares of SuccessFactors common stock at a price of $23.22 per share. A few days later, on November 28, 2011, Marchand purchased an additional 213 shares of SuccessFactors common stock at a price of $23.42 per share, for a total of 1,728 shares.

22.     On December 3, 2011, SAP and SuccessFactors announced a definitive merger agreement pursuant to which a subsidiary of SAP would acquire SuccessFactors for $40 per share in a tender offer. On December 5, 2011, the first trading day after the merger announcement, the price of SuccessFactors common stock closed at $39.75, an increase of $13.50 or 51.4 percent over the prior trading day's close.

23.     On December 8, 2011, Marchand sold his 1,728 shares of SuccessFactors common stock at a price of $39.81 per share, realizing illicit profits of $28,061.

### *Marchand Trades SAP ADRs While Aware of SAP's Favorable Financial Results*

24.     On January 2, 2012, at the request of SAP's Co-CEO, Marchand asked an SAP employee to provide him with software revenue figures for the fourth quarter and year ended 2011. Marchand acknowledged that these numbers were "confidential" and would "not be showed before the official release of the results." In response to Marchand's request, via email the SAP employee provided Marchand with SAP's 2011 preliminary performance figures which

indicated, among other things, that SAP had achieved its "best ever" software revenue figures. In addition to this email, in January 2012 Marchand had access to other SAP documents concerning SAP's favorable financial performance.

25.    On January 9, 2012, while knowingly possessing information indicating that SAP soon would release favorable financial results to the public, Marchand purchased 549 SAP ADRs at a price of $54.57 per unit.  The price of SAP ADRs increased $1.31 or approximately 2.5 percent on January 13, 2012, versus a drop of approximately 0.5% in the S&P 500, after SAP announced its preliminary financial results for the period ended December 31, 2011, including its "best ever" full year and fourth quarter performance and "record" software revenue figures.

26.    Marchand sold his 549 SAP ADRs on January 25, 2012 at a price of $58.50 per unit, realizing illicit profits of $2,157.

### *Marchand Trades Ariba Common Stock While Aware of SAP's Plans to Acquire Ariba*

27.    By March 5, 2012, SAP senior executives, including SAP's co-CEO, began serious internal discussions regarding SAP's potential acquisition of Ariba.  On March 25, 2012, SAP notified Ariba of its interest in exploring a potential acquisition.  On April 2, 2012, Ariba and SAP entered into a confidentiality agreement, and, on April 11, 2012, SAP delivered to Ariba an indication of interest to acquire Ariba for $38.50 per share.  The parties continued negotiations over the next six weeks, with SAP submitting its third and final indication of interest to acquire Ariba for $45 per share on May 2, 2012 and the parties entering into an exclusivity agreement on May 3, 2012.

28.    By mid-April 2012, Marchand knew about SAP's plans to acquire Ariba.  In late March and April 2012, Marchand had access to SAP documents concerning Project Angel,

SAP's code name for the Ariba acquisition project, and he engaged in verbal and email communications with persons who were aware of SAP's plans to acquire Ariba.

29. On April 3, 2012, in response to an email from an SAP employee who expressed that SAP should acquire Ariba, Marchand wrote: "I sense a big appetite on the co-ceo side of the fence."

30. Later, on April 12, 2012, Marchand indicated his awareness of the Ariba acquisition project in an email to SAP's Co-CEO as he discussed his offer to assist an SAP employee with the post-merger integration of "Angel."

31. On April 16, 2012, Marchand purchased 857 shares of Ariba common stock at a price of $34.98 per share.

32. On May 1, 2012, SAP's Executive Board met and authorized SAP's management to submit a revised indication of interest to acquire Ariba for $45 per share. SAP delivered that revised indication of interest to Ariba on May 2, 2012.

33. That same day, on May 2, 2012, Marchand purchased 515 shares of Ariba at a price of $38.85 per share, and, on May 8, 2012, Marchand purchased 385 additional shares of Ariba at a price of $38 per share.

34. On May 22, 2012, SAP and Ariba announced an agreement pursuant to which a subsidiary of SAP would acquire Ariba for $45 share. That day the price of Ariba's common stock closed at $44.87, an increase of $7.23 or approximately 19 percent above the prior trading day's close.

35. On May 23, 2012, Marchand sold his Ariba common stock at a price of $44.90 per share, realizing illicit profits of $13,282.

*Marchand Violated the Federal Securities Laws*

36.     In violation of a fiduciary duty, or obligation arising out of a similar relationship of trust and confidence he owed to SAP, its affiliate SAP Labs LLC, and/or the shareholders of SAP, Marchand misappropriated and/or used material nonpublic information concerning SAP's and/or its affiliates' plans to acquire SuccessFactors, SAP's and/or its affiliates' plans to acquire Ariba, and SAP's fourth quarter and year end 2011 results.

37.     At the time of each respective illegal trade identified herein, the information Marchand had received or obtained was confidential, nonpublic and related to SAP's and/or its affiliates' business and prospective strategic acquisitions.

38.     In each instance the information was material – it would have been important to a reasonable investor in making his or her investment decision, and, indeed, it was important to Marchand when he made his investment decisions.   There is a substantial likelihood that disclosure of the information would have been viewed by a reasonable investor as having significantly altered the total mix of information available to investors.   In addition, the information was considered confidential by the companies that were the sources of the information, and these companies had policies protecting such confidential information.

39.     Marchand, in each instance, traded on the basis of material nonpublic information.

40.     At all times relevant to the complaint, Marchand acted knowingly or recklessly.

*Marchand Traded in Connection With A Tender Offer While In Possession Of Material Non-Public Information*

41.     By November 21, 2011, the date on which Marchand began the illegal trading in the common stock of SuccessFactors alleged herein, one or more substantial steps had been taken to commence the tender offer for SuccessFactors common stock.

42.     When he traded in SuccessFactors common stock, Marchand was in possession of the material nonpublic information relating to the tender offer for SuccessFactors and knew or had reason to know that the information was nonpublic and had been acquired, directly or indirectly, from the offering entities, the issuer of the securities sought or to be sought by the tender offer, and/or an officer, director, partner or employee acting on behalf of the offering entities or such issuer.

43.     Prior to trading in connection with this tender offer, the material nonpublic information known to Marchand and the source of that information were not disclosed.

44.     Accordingly, Marchand was required to abstain from trading in the common stock of SuccessFactors.

## CLAIMS FOR RELIEF

## FIRST CLAIM

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

45.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 44, inclusive, as if they were fully set forth herein.

46.     By engaging in the conduct described above, Marchand knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

   a.   employed devices, schemes, or artifices to defraud;

   b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

47.     By engaging in the foregoing conduct, Marchand violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

48.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 47, inclusive, as if they were fully set forth herein.

49.     By engaging in the conduct described above, in connection with a tender offer, Marchand, knowingly or recklessly, engaged in one or more fraudulent, deceptive or manipulative acts.

50.     By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELEIF

**WHEREFORE**, the Commission respectfully requests that the Court enter Final Judgment:

I.

Permanently restraining and enjoining Marchand and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Sections

10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

II.

Ordering Marchand to disgorge all unlawful trading profits and any other ill-gotten gains received as a result of the conduct alleged in this Complaint, together with prejudgment interest thereon;

III.

Ordering Marchand to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

IV.

Granting such other and further relief as this Court may deem just, equitable and necessary.

Dated: December 23, 2013

Respectfully Submitted,

By: _____
Brendan P. McGlynn
John V. Donnelly III
Oreste P. McClung
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
mcglynnb@sec.gov
donnellyj@sec.gov
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>v.<br><br>DAVID F. MARCHAND,<br><br>                              Defendant. | Case No.<br><br>**DESIGNATION OF<br>AGENT FOR SERVICE** |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action.  Therefore, service upon the United States or its authorized designee, Paul Blaine, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

        s/ John V. Donnelly III
John V. Donnelly III
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
donnellyj@sec.gov
(215) 597-3100

14